**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | 18 Cr. 217 (KMW) |
| v. |  |
| TODD SCHLIFSTEIN, | **Sentencing Date**: October 23, 2019 at 2:00 p.m. |
| Defendant. |  |

**SENTENCING MEMORANDUM ON**
**<u>BEHALF OF DR. TODD SCHLIFSTEIN</u>**

**TABLE OF CONTENTS**

Page

I.      PRELIMINARY STATEMENT ...................................................................................1

II.     PLEA AGREEMENT ..............................................................................................4

III.    THE § 3553(A) FACTORS WARRANT A BELOW GUIDELINE SENTENCE............5

    A.      Dr. Todd's History and Characteristics Warrant a Below-Guideline
          Sentence ..........................................................................................................5

          1.      Dr. Todd Decides To Become a Doctor at An Early Age ..........................5

          2.      Dr. Todd Worked His Way Through College, Medical School and
                 Residency to Become a Doctor....................................................................6

          3.      Dr. Todd Devoted His Career to Helping Patients in Chronic Pain
                 and to Numerous Related Civic and Charitable Causes .............................8

          4.      Dr. Todd Started His Own Medical Practice With the Support of a
                 Dedicated Staff And Many Loyal Patients ................................................10

          5.      Dr. Todd's Lifetime of Service to His Patients, Community, and
                 Family Warrant a Below Guideline Sentence.............................................15

    B.      The Nature and Circumstances of the Offense Warrant a Below-Guideline
          Sentence ........................................................................................................17

          1.      Several Mitigating Factors Should Be Considered    When
                 Evaluating Dr. Todd's Entry and Participation in the Subsys
                 Speaker Series............................................................................................17

          2.      A Sentencing Range of 46 to 57 Months Overstates Dr. Todd's
                 Culpability.................................................................................................22

    C.      A Lengthy Sentence of Imprisonment Is Not Needed to Reflect the
          Seriousness of the Offense, Promote Respect for the Law, or Impose Just
          Punishment....................................................................................................24

    D.      A Lengthy Sentence of Imprisonment Is Not Needed to Deter Future
          Misconduct or Protect the Public ...................................................................26

IV.     CONCLUSION...................................................................................................28

# TABLE OF AUTHORITIES

## Cases

*United States v. Anderson*,
 85 F. Supp. 2d 1084 (D. Kan. 1999) ................................................................ 22, 26

*United States v. Butler*,
 264 F.R.D. 37 (E.D.N.Y. 2010) ................................................................................ 27

*United States v. Dela Torre*,
 11-cr-54-5 (N.D. Ill.) ................................................................................................ 15

*United States v. Douglas*,
 713 F.3d 694 (2d Cir. 2013) ...................................................................................... 5

*United States v. Gaind*,
 829 F. Supp. 669 (S.D.N.Y. 1993) ........................................................................... 26

*United States v. Glick*,
 142 F.3d 520 (2d Cir. 1998) .................................................................................... 24

*United States v. Gonzales*,
 11-cr-54-6 (N.D. Ill.) ................................................................................................ 15

*United States v. Gonzalez*,
 566 F. App'x 898 (11th Cir. 2014) ........................................................................... 23

*United States v. Greene*,
 249 F. Supp. 2d 262 (S.D.N.Y. 2003) ............................................................... 15, 22

*United States v. Hoffmann*,
 2006 WL 3390736 (D. Neb. Nov. 22, 2006) ........................................................... 27

*United States v. Leon*,
 2 F. Supp. 2d 592 (D.N.J. 1998) ............................................................................. 22

*United States v. Metellus*,
 2010 WL 1174303 (E.D.N.Y. Mar. 17, 2010) .......................................................... 25

*United States v. Mora–Gomez*,
 875 F.Supp. 1208 (E.D.Va. 1995) ........................................................................... 27

*United States v. Nesbeth*,
 188 F. Supp. 3d 179 (E.D.N.Y. 2016) ..................................................................... 25

*United States v. Nwaokocha*,
 12-cr-559-4 (N.D. Ill.) .............................................................................................. 21

*United States v. Patel*,
 11-cr-491-5 (N.D. Ill.) .............................................................................................. 27

*United States v. Pena*,
 268 F.3d 215 (3d Cir. 2001) .................................................................................... 24

*United States v. Ricard*,
    922 F.3d 639 (5th Cir. 2019) .................................................................................. 22

*United States v. Serafini*,
    233 F.3d 758 (3rd Cir. 2000) ................................................................................. 16

*United States v. Shaw*,
    2004 WL 1858336 (E.D. Pa. Aug. 11, 2004) ...................................................... 27

*United States v. Thurston*,
    544 F.3d 22 (1st Cir. 2008) ................................................................................... 15

*United States v. Tomko*,
    562 F.3d 558 (3d Cir. 2009) .................................................................................. 16

*United States v. Valverde-Solano*,
    299 F. App'x 21 (2d Cir. 2008) ............................................................................ 27

## <u>Statutes</u>

18 U.S.C. § 1349 .......................................................................................................... 15
18 U.S.C. § 3553 ............................................................................................................ 5
18 U.S.C. § 371 .......................................................................................................... 1, 4
42 U.S.C. § 1320a-7b .................................................................................................... 1

## <u>Other Authorities</u>

U.S.S.G. 2B4.1 ............................................................................................................. 24
U.S.S.G. 2C1.1 ............................................................................................................. 24

## I.   PRELIMINARY STATEMENT

Defendant Dr. Todd Schlifstein, through his counsel, respectfully submits this Sentencing Memorandum to assist the Court in determining an appropriate sentence following his guilty plea to one count of conspiracy to commit an offense against the United States—namely, a violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1)(B)—in violation of 18 U.S.C. § 371.

As discussed below, apart from the conduct that underlies his conviction, "Dr. Todd" (as he was affectionately known to his patients) has lived an exemplary life dedicated to the service of others.  Raised in a working class home, where hard work was prized above all, Dr. Todd decided at an early age that he wanted to become a doctor so that he could help others.  He worked his way through college, medical school, and residency to achieve that goal, and received his medical license in 1996.  Since then, over his nearly 25-year career as a pain management and rehabilitation doctor, he has helped thousands of patients undergoing treatment for cancer and other ailments address chronic and debilitating pain with the highest level of empathy and compassion.  Such dedicated service has earned him praise and appreciation from his patients and staff (who Dr. Todd regards as family), as well as from professional colleagues who referred and entrusted the care of their patients to Dr. Todd.  They have submitted dozens of letters to the Court, requesting leniency.

Dr. Todd's positive impact on the lives of others, however, goes far beyond his devoted patient care.  Throughout his career, he has dedicated thousands of hours to professional, civic, and charitable causes, all in the name of helping others.  Such good works have included lectures and publications in which he helped educate the medical community about best pain management practices.  He has also volunteered hundreds of hours to treat athletes of the Special Olympics, Golden Gloves, and the New York City Marathon.  The civic work that he is perhaps most proud of, however, is helping to found and lead the New York Pain Management Society,

1

an organization dedicated to serving patients with chronic pain.  For his work in helping to found and direct that society, the New York State Assembly in 2016 issued a Proclamation on behalf of the people of the State of New York expressing gratitude for his work.  *See* Ex. 3.  Through these and other charitable endeavors, Dr. Todd has helped countless people.

Against the backdrop of this life dedicated to the care and service of others, Dr. Todd now comes before the Court, convicted of accepting kickbacks (in the form of speaking fees) in return for prescribing a pain medication known as Subsys.  No words can express the shame and remorse Dr. Todd feels for violating the trust of his patients.  Although each of the patients to whom he prescribed Subsys stood to benefit from the medication, Dr. Todd recognizes that all were entitled to his independent medical judgment.  Instead, Dr. Todd allowed his judgment to be compromised to favor Subsys over competing drugs, in order to be awarded more speaking engagements (and fees) by Subsys' manufacturer.  As a result of his crime, Dr. Todd's life has been shattered and the one thing that meant the most to him—his ability to practice medicine and help others—has been taken away.

Dr. Todd's conviction is completely inconsistent with how he has otherwise lived his life and conducted his career.  When Dr. Todd looks back on this aberrant behavior, he sees now that his entry into the Subsys speaking series occurred at a uniquely vulnerable moment in his life.  In January 2014, his younger brother and best friend Craig died unexpectedly from complications from a stroke, leaving behind his wife and two young daughters.  Operating in a fog of depression caused by Craig's passing, grieving for the loss of his closest friend, and under the stress of the sudden assumption of responsibilities for his nieces, Dr. Todd allowed himself to be drawn into the corrupt Subsys speaker series, which offered him a respite and distraction from his sorrow.

2

We respectfully submit that Dr. Todd's conduct—however serious—does not warrant the severe prison term of 46 to 57 months contemplated by the United States Sentencing Guidelines (or even the 36 months recommended by the Probation Office).  That guideline range is driven by a 16-level increase under U.S.S.G. § 2B1.1's Loss Table, based upon the "value of the improper benefit conferred" by Dr. Todd on Subsys' manufacturer, Insys, ranging between $1.5 to $3.5 million.  We understand that this calculation represents the net sales Subsys' manufacturer received from Dr. Todd's total prescriptions of Subsys, but does not take into account (or deduct) the prescriptions Dr. Todd would have prescribed Subsys anyway even without the influence of the speaker fees.  Nor does the calculation deduct Subsys' manufacturer's costs in producing and selling the drug, resulting in further inflation of the "benefit conferred" calculation.  Under these circumstances, we respectfully submit the Guideline calculation is unduly punitive and overstates Dr. Todd's culpability.  It also overlooks other mitigating factors, including that Dr. Todd (a) did not join the speaker series with the intention of engaging in wrong-doing; indeed, for many months after his entry into the speaker series, Dr. Todd's prescribing practices did not change, which resulted in him being reprimanded and retaliated against by Subsys' sales representatives; and (b) only prescribed Subsys to patients who he believed could benefit from the medication and refused to prescribe this medication to anyone he did not believe would be helped.

Despite these mitigating factors, Dr. Todd knows that what he did was completely wrong and it will never be repeated again.  Because of this grave mistake, Dr. Todd has suffered public humiliation and ridicule.  He has caused suffering to his family, including his two nieces who regard him as a family figure.  He has also lost his medical license, his medical practice, and his ability to do the job that he loves—taking care of patients.  For a man without children of his

own, and who regards his patients and staff as his extended family, this loss has been devastating.  Dr. Todd will now spend the remainder of his life seeking redemption from his family, friends, and the community.

These collateral consequences represent significant punishment.  We respectfully suggest that a sentence well below the Guidelines range that takes into account these consequences as well as the extraordinary amount of good Dr. Todd has done as a doctor, an educator, a community member, and as a family man, is appropriate.  A sentence of home confinement or, in the alternative, a minimal period of imprisonment, would be sufficient but not greater than necessary to fulfill the goals of sentencing.

## II.    PLEA AGREEMENT

Dr. Todd entered into a plea agreement with the Government on June 10, 2019, in which he pled guilty to Count One of the Indictment, which charged him with participating in a conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371.  Ex. 2 at 1. Under the plea, Dr. Todd stipulated to a Guideline offense level of 23, which carries a Guidelines range of 46 to 57 months imprisonment, and a fine range from $20,000 to $200,000. *Id.* at 2. He reserved his right to seek a non-Guidelines sentence based on the 18 U.S.C. § 3553(a) factors. *Id.* at 3.  Dr. Todd also agreed to make restitution, and forfeit $127,000, which represents the amount of money he was paid in respect of the speaking fees at issue.  *Id.*

On June 26, 2019, Dr. Todd enter his guilty plea to Count One of the Indictment with this Court, and admitted that he was "paid fees from the pharmaceutical company in the form of lecture fees that had the influence of me choosing their drug, Subsys, over other medications" and that it was "not right." Plea Tr. 18:13-15. This Court accepted the guilty plea on July 8, 2019. ECF No. 126.

4

**III.     THE § 3553(A) FACTORS WARRANT A BELOW GUIDELINE SENTENCE**

Under 18 U.S.C. § 3553(a), a sentencing court must "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing set forth therein.  In determining the sentence, the Court must consider the nature of the offense and history and characteristics of the defendant.  *Id.*  Further, the sentence imposed must, among other things, (a) reflect the seriousness of the offense, promote respect for the law and provide just punishment; and (b) afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant.  *Id.*; *see United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013).  We respectfully believe that Dr. Todd's personal history, the specific circumstances of this offense, and the severe collateral consequences he has already suffered all weigh in favor of a substantial reduction to his sentence below the Guideline range.  A non-Guidelines sentence will satisfy the each of the sentencing factors under 18 U.S.C. § 3553(a).

**A.     Dr. Todd's History and Characteristics Warrant a Below-Guideline Sentence**

1.     *Dr. Todd Decides To Become a Doctor at An Early Age*

Todd was born in Queens to two public school teachers, Alan and Michele Schlifstein. They raised a family of three boys:  Todd, his older brother Brett, and younger brother Craig.  He recalls his home as a loving one, where his maternal grandmother lived with the family and helped raise the children.  He also recalls that the value of hard work was instilled in him and his brothers at an early age.  In addition to regular chores around the house, Todd worked a newspaper route to earn money and help his family.  The Schlifsteins also required the boys to approach their academics with the same work ethic; excellence and achievement were expected.

Looking back, Dr. Todd recalls deciding that he wanted to become a doctor from a young age.  He states, "Ever since I was a kid, that was all I ever wanted to do. I do not come from a

wealthy family and no one gave me any short cuts…My parents were so proud of me when I became a doctor and I was so proud to return their belief in me." Ex. 1 at 1.

Having set his mind on a career where he could help others, Todd dedicated himself in high school to his studies, especially science courses, and also pursued medical and scientific volunteer and research opportunities.  For example, he volunteered from the age of 12 to 18 at local hospitals, like South Shore Hospital, to deliver packages, and transport medical supplies. He also attended summer programs at Hofstra University, the University of Iowa, and Boston University, targeted to students interested in medical and science careers.  Even as a teenager, Todd sacrificed social time to pursue those academic and research opportunities.  It was his work ethic and commitment to medicine and science that drove him.  As his childhood friend Adam Goldin explains, "Todd excelled in school in every subject, but that success came from diligent and tireless effort.  He studied like no one else I knew." Ex. 4 at 41.[1]

> 2. *Dr. Todd Worked His Way Through College, Medical School and Residency to Become a Doctor*

Following his graduation from high school, Todd attended Cornell University where he majored in Nutrition.  To pay tuition, Todd took out loans and paid his way with a variety of work-study programs, often in blue collar jobs doing manual labor or catering.  For example, Todd recalls working weekends at a kosher deli doing catering and event promotion.  On summer breaks, he worked in construction, and later as a licensed pest exterminator.  The money he earned helped pay for his tuition.  When not working, he used the remaining time he had to keep up with his courses, and eventually, study for the MCATs and apply to medical school.

---

[1]  All of the letters submitted by Dr. Todd's family, friends, patients and professional  colleagues are collated in alphabetical order in Exhibit 4.

In 1991, following his graduation from Cornell, Todd was admitted to the New York College of Osteopathic Medicine.  He moved back home to save money, but paid for his room and board by helping his parents with repair projects around the house, like paving the driveway and building an outdoor deck.  He also worked some part time jobs to help pay for tuition, while also taking a full medical school course-load.  Despite his busy schedule, Dr. Todd made time for his family, especially his grandmother.  As Harvey Schlifstein describes, even though "[h]e barely had enough money for himself " Todd "made time to see [his grandmother] and buy her groceries." Ex. 4 at 65.

After he graduated from medical school in 1995, he began his residency at NYU Medical School.  Dr. Todd took on additional jobs during his residency—including working night shifts covering medical floors—to help make ends meet.  He sometimes worked around the clock: first a 7 a.m. to 6 p.m. shift for residency, then from 7 p.m. to 7 a.m. on the floor.  In addition to working these extra shifts, Dr. Todd also juggled duties as the Chief Resident at Bellevue Hospital and the Administrative Chief Resident at NYU Medical Center.  In 2000, Dr. Todd became board certified in Physical Medicine and Rehabilitation.  As Mr. Goldin explains, Dr. Todd was a "tireless worker who never looked for a short cut because he realized that one can only succeed through hard work and dedication."  Ex. 4 at 41.

In the midst of these milestones, Dr. Todd's mother contracted a rare liver disease in 2000.  Dr. Todd devoted himself to his mother's care until she passed away in 2002.  As his uncle Harvey Schlifstein notes, "He moved [his mother] to NYU for all her care, so he could be directly involved with her care. Visiting every night when she was in the hospital day and night. When she wasn't in the hospital she stayed with him and his little brother… . He did everything he could to ensure his mother was getting the best care possible."  Ex. 4 at 65.  Another friend,

Ms. Rosemarie Gabrielle also describes Dr. Todd's dedication to his family and his mother's care, stating, "Todd was there for everything. He was their [sic] for morning rounds and evening rounds everyday….Todd would have his mother stay with him at his apartment, across the street from the hospital. His mom was in and out of the hospital many times over those couple of years." *Id.* at 38.

3.   *Dr. Todd Devoted His Career to Helping Patients in Chronic Pain and to Numerous Related Civic and Charitable Causes*

Upon completing his residency in 1999, Dr. Todd began work as an attending physician in private practice with Spine Sports Rehabilitation Associates.  Dr. Todd worked on a daily basis treating and caring for thousands of patients experiencing severe, chronic pain as a result of cancer, spinal cord injuries, and other ailments.  He became highly experienced with safely prescribing pain medications known as Transmucosal Immediate Release Fentanyl ("TIRF") products, a category to which the medication at issue in this case, Subsys, belongs.  PSR ¶ 35. Dr. Todd frequently shared his experiences and knowledge of best practices in prescribing TIRF drugs at medical school lectures and continuing education conferences.

In addition to the above work, Dr. Todd also devoted himself to numerous voluntary, civic and charitable causes. These included:

- lecturing in high schools in New York City, Long Island, and New Jersey to teach students about health careers and the dangers of steroids;

- serving as a Medical Volunteer for the New York City Marathon, and as a Team Captain with the Achilles Club—positions which required him to devote dozens of hours annually to assist special needs participants with their equipment, and provide any necessary treatment at the start and finish line; as Team Captain, Dr. Todd also took on the additional responsibility of recruiting other physicians to volunteer;

- Providing medical clearance exams and necessary follow-up to participants in the Special Olympics and New York Golden Gloves annual boxing tournament; and

- Serving as a Board Member of the Worldwide Children's Fund, an organization dedicated to helping children worldwide who are suffering the effects of poverty, disease, natural disaster, famine, abuse, civil strife, and war.

More recently, Dr. Todd has begun working with the PCNY in the Streets ("PCNY"), helping with their backpack drive and distributing thousands of backpacks to disadvantaged children, as well as helping feed the homeless at PCNY's kitchen.   He has also started volunteering this past year with the Building Israelis and Palestinians charity, whose mission is to foster trust between Israelis and Palestinians through work projects that increase the quality of life in their communities. *See* Building with Israelis & Palestinians, http://www.bipnow.org/ (last visited Oct. 9, 2019).   Besides these volunteer activities, Dr. Todd has donated money to numerous other charitable causes.[2]

Although Dr. Todd's civic and charitable works are numerous, he is most proud of his role in helping to found the New York Pain Society in 2011.  Following the society's founding, Dr. Todd served on the Society's Board and helped grow the organization's influence and reach through numerous public and private collaborations.   These collaborations included working with the U.S. Pain Foundation to teach patients and families how to manage chronic pain, as well as with the Workers' Compensation Board and Workers' Compensation Alliance to champion the cause of injured workers. *See* Ex. 3.   The society has also obtained an educational grant to provide free SAFE Opioid Prescribing Courses to all prescribing physicians in New York, including programs in White Plains, New York City, Buffalo, and Albany. *Id.*   The society also puts on an annual conference that highlights new innovations for pain therapy, and invites

---

[2]   These include to the New York State Park Police PBA, Cancer Survivors Fund, American Stroke Association, American Cancer Society, Childhood Cancer Society, American Heart Association, Rooms to Read, Chai Lifeline, Cancer Survivors Fund, Childhood Leukemia Foundation, the National Association of Chiefs of Police, the Veteran's Relief Network, and the Volunteer Firefighter Alliance.

leaders in the field of pain management to educate the medical profession on best practices.  *See* New York Pain Society, https://www.nypainsociety.org/ (last visited Oct. 9, 2019).  Until he was required to resign from the Board of Directors as a result of his conviction, Dr. Todd attended weekly meetings at the New York Pain Society and volunteered more than 100 hours annually to its work.  *See* Ex. 4 at 16 (Dr. Bradley Cash observing that Dr. Todd "lectured on various topics annually and spent countless hours with meetings and planning for ongoing education").

Such extraordinary medical care and charitable work has won Dr. Todd the admiration of his colleagues, family and friends.  As Harvey Schlifstein notes, "I know he donates regularly and volunteers for many charities, and seeks no credit for it."  Ex. 4 (H. Schlifstein Ltr.) at 65. Similarly, Jacqueline Beaubien, a friend since 2012, notes that "Todd has always given back to those around him."  Ex. 4 at 11 (noting his work with PCNY).

Finally, Dr. Todd has regularly been recognized as one of the top physicians in the country based upon peer and patient nominations.  Dr. Todd's good works was recognized by the New York State Assembly, which on April 1, 2016, issued a proclamation recognizing his service to the medical profession and applauding him on behalf of "the chronic pain patients and families of the state of New York."  Ex. 3.

4. *Dr. Todd Started His Own Medical Practice With the Support of a Dedicated Staff And Many Loyal Patients*

In 2009, Dr. Todd decided to leave Spine Sports and start his own medical practice, called the Fountain Medical Group, with his medical school classmate, Dr. Jeffrey Goldstein (a co-defendant in this case).  As a testament to his dedicated patient care, most of those patients followed Dr. Todd to his new practice. He worked tirelessly to establish his practice, routinely working 6 or 7 days a week and rarely taking any time off.  As a result of his close care and attention to the practice, it quickly grew and attracted new patients.

Although his conviction stands contrary to his prior work, Dr. Todd was an early and strong proponent of protecting his patient from the risks of pain medication, and imposing controls and safety measures for patients to whom pain medication was prescribed.  For example, before allowing patients to use the medication, he personally educated them about the benefits and risks, which he then sought to reinforce by having them enter into "prescription agreements" wherein the patients acknowledged they could be discharged if they used the medications improperly.  He also had them sign opioid consent forms acknowledging the risks of the medication.  Furthermore, beginning in or around 2007, Dr. Schlifstein instituted randomized and routine urine testing for his patients, to ensure that the proper dosages were being used.

These testing measures were not yet the standard of care but Dr. Schlifstein instituted them because he wanted to protect his patients against the risk of abuse and addiction.  This sometimes resulted in Dr. Schlifstein losing patients, who were critical of the guardrails he instituted.  Dr. Schlifstein regarded the safety of his patients as paramount, however.  As one former intern, Fay Jouni, has observed, "Dr. Todd made sure to always prioritize the patient's safety above all. I have watched him many times decline certain procedures because he didn't feel it was at all safe or in the client's best interest." Ex. 4 at 45.  This sentiment in echoed it a letter submitted by one of Dr. Schlifstein's patients, Mariarosaria Ciavolino: "He unfailingly reached out to make sure I was always okay, and my pain manageable. He did so without over prescribing medication." Ex. 4 at 19.

Dr. Todd's devotion to his patients is reflected in the numerous other letters they have written on his behalf.  Indeed, many recall instances when Dr. Todd provided services for free or at reduced rates when they had financial hardships or lacked insurance.  This included prescribing Subsys to patients when they did not have insurance—Dr. Todd believed the

medication could alleviate their pain and wanted his patients to benefit from the treatment. A sampling of those letters is described below:

- *Julie Ardito,* whose daughter was a patient after a horrific accident, discussed how Dr. Todd "spoke to her and how he discussed with her the things she would need to do to help her body heal."  Ex. 4 at 6.

- *Mariarosaria Ciavolino*, a patient since 2008, describes how Dr. Todd "spent countless hours researching, learning and then teaching me about proposed treatments" all "while maintaining the utmost professionalism." *Id.* at 18.

- *Lauralee Corratti*, a patient for over 15 years, describes how Dr. Todd is a "medical professional in all aspects of the term" and "treats his patients with the highest level of integrity and with the utmost respect." *Id.* at 25.

- *Pasquale Dipippo*, a patient for almost 10 years, describes Dr. Todd's professionalism, including how his intentions "would never be to hurt someone but to make them feel safe and secure." *Id.* at 30.

- *Valerie Estrada*, a former patient who has known Dr. Todd for over 20 years, describes how he treated her for influenza and kidney stones even without insurance and that he "took care of me…without ever sending me a bill or charging me." *Id.* at 33.

- *Serafina Fiore*, a patient since 1998, also describes how Dr. Todd treated her even when she didn't have insurance and "went out of his way with physical therapy and aftercare." *Id.* at 35.

- *Fay Jouni*, a patients for almost 5 years, describes how he is "one of the most caring, thoughtful, and ethical doctors I have yet to meet." *Id.* at 45.

- *Jane Manzari*, a patient for 25 years, describes him as a "great doctor" and how "he truly loves his patients." *Id.* at 54-55.

- *Evelyn Ramirez*, a patient for 10 years and now an employee, describes how he helped her "achieve a better quality of life" and created "a work environment that only has the best interest of his patients." *Id.* at 60.

- *Sarah Kate Sporleder*, a patient since 2012, describes how she knew that "he always had my health and well-being in his best interest" and even referred 10-12 friends "who once they saw him would never go anywhere else." *Id.* at 73.

- *Helio Teran*, a patient since the early 2000s, describes how Dr. Todd treated him after a serious motorcycle accident left him injured and nearly bankrupt, and gave him a generous payment plan. *Id.* at 74.

12

- *Andreas Vavaroutsos*, a patient for over 20 years, says Dr. Todd "is brilliant when it comes to sports medicine." He also describes "his corporate culture [as] one of the best I have seen" because "[a]ll his employees are happy and so are their customers." *Id*. at 76.

- *Jill Weinstein*, who has been a patient for 7 years, highlights his "extremely warm, friendly and kind" demeanor and that he "always treated us right." *Id.* at 78.

Serafina Fiore, a patient since 1998, put it best when she aptly described Dr. Todd as "quite literally the definition of the word [doctor] in which he really is a person who lives and breathes to take care of those who are afflicted and restore them to health." *Id.* at 35.

Dr. Todd's care for his patients is also the subject of numerous letters from people who saw his work up close, every day:  his staff members.  They provide glowing reviews of not only his care for patients, but his treatment of his staff, who he treated as family and in whom he took an interest in their lives and career development:

- *Bridget Cisneroz*, a former esthetician and spa director at Fountain Medical Spa who has known Dr. Todd since 2011, describes how he "took his time with everyone, not only to listen to their ailments and provide care but also he got to know them personally…[T]hey didn't care if they had to wait for hours to see him, they knew it was worth it because he would give them the time they needed." *Id.* at 20.

- *Jason Correa*, a current employee at EGA Medical, notes that his "character of faithfulness and devotion to his loved ones, friends and employees is unmatched." *Id.* at 26.

- *Christina Flores*, an employee at Fountain Medical Spa since 2013, describes how Dr. Todd took a chance on hiring her with no medical experience and then helped guide her career. "He is the leader and father figure to our team." *Id.* at 36.

- *Danielle Lebel*, a medical and surgical assistant employed under Dr. Todd's direction at EGA Medical, explains that he is "not only a leader in his field from a technical standpoint, but his bedside manner and respect for his patients is demonstrated to be at a level that just can't be taught." *Id.* at 48.

- *Maribel Ramirez*, a medical aesthetician who has worked with him for 11 years, describes how Dr. Todd supported her to get a job in the medical field, and describes how he is "one of the most caring, dedicated and patient doctors I have ever met" and notes his "passion for medicine and love for his patients." *Id.* at 61.

- *Alessandra Wellborn*, a licensed esthetician who has known him for 7 years, has been "inspired and guided by his drive, philanthropy, kindness and work ethic." *Id.* at 79.

13

Dr. Todd is not only  regarded highly by his staff but also fellow doctors and other professional colleagues who have seen his high standard of care for his patients and have continued to refer patients to him based on the positive feedback they received:

- *Dr. David Antell* describes how Dr. Todd "exhibits the upmost respect for his patients….Caring, loving, sympathetic and professional would be my choice of adjectives describing this doctor." *Id.* at 4.

- *Marie Day*, an administrative manager at NYU's Pain Management Center for over 10 years, described how "different patients told me numerous times that he treated them respectfully, and with the greatest concern for their suffering." *Id.* at 27.

- *John DeNiro*, a regional manager at a performance beauty company who has known Dr. Todd professionally for more than 6 years, notes that he "is one of the most kind and thoughtful physicians I have ever met." *Id.* at 29.

- *Francesco Di Turi*, a medical device consultant for a medical technology company who has worked with Dr. Todd for 5 years, describes how Dr. Todd holds himself to "the highest standards of his practice" and is "not only an outstanding physician, a highly regarding member of our community, a pillar of honor and principle…[but] an even a better man and friend!" *Id.* at 31.

- *Dr. David Greuner*, a colleague who has known Dr. Todd for over 6 years, describes how he has "never met a colleague that had anything but glowing comments about Todd" based on his "competency, compassion and professional resolve." *Id.* at 43.

- *Dr. Elliot Hershman*, who has known Dr. Todd for over twenty years professionally, notes that he referred many patients to him over the years based on his "thoughtful and compassionate care." *Id.* at 44.

- *Dr. Howard Levy*, an orthopedic surgeon who has known Dr. Todd for 15 years, describes how he "always treated patients with the highest standards of care and all of the orthopedists trusted him implicitly" and even described how Dr. Todd would "refer patients for surgery only when necessary and conservative treatment failed to improve the symptoms." *Id.* at 52.

- *Dr. Shawn Sadri* describes how "patients, friends and anyone who I referred to Dr. Todd which includes myself only spoke highly of him as a person and as a doctor." *Id.* at 63.

- *Dr. Jhonny Salomon*, a colleague for 6 years, describes Dr. Todd as "kind, dependable and well regarded amongst his peers." *Id.* at 64.

14

5. *Dr. Todd's Lifetime of Service to His Patients, Community, and Family Warrant a Below Guideline Sentence*

Courts have recognized that a defendant's good works—in particular, a defendant giving his time—are a basis for a sentence below a Guideline sentence. *See United States v. Greene*, 249 F. Supp. 2d 262, 265 (S.D.N.Y. 2003) (reduction from a Guidelines range of 18 to 24 months to probation granted in part based on defendant's extraordinary good works and giving of a "valuable commodity, his time").

For example, in *United States v. Thurston*, the defendant was convicted of conspiring to defraud Medicare of over $5,000,000. 544 F.3d 22 (1st Cir. 2008). The Guidelines recommended a 60-month sentence but the Court on appeal affirmed a 3-month prison sentence based on, among other things, defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others." *Id.* at 26.

The physician defendant in *United States v. Dela Torre*, 11-cr-54-5 (N.D. Ill.) also received a substantial guidelines reduction based on charitable works. There, the defendant doctor plead guilty to tax evasion and admitted to receiving cash payments from a home health agency that were the proceeds of a systematic health care fraud in which she signed false orders and allowed others to forge her signature. Dr. Dela Torre's Guideline range was 30 to 37 months, but she pleaded for leniency based in part on her charity work and the collateral consequences of losing her medical license. Dela Torre Sentencing Memorandum, 11-cr-0054-5 (N.D. Ill. July 8, 2014), ECF No. 257. The Court sentenced her to probation.

Similarly, in a related matter, *United States v. Gonzales*, 11-cr-54-6 (N.D. Ill.), the defendant Dr. Gonzalez, plead guilty to conspiracy to commit healthcare fraud in violation 18 U.S.C. § 1349 and faced a Guidelines range of 12-18 months. He pleaded for leniency based in part on his history of extraordinary service, volunteerism, genuine expression of remorse, and

collateral consequences based on losing his medical license.  Gonzales Position Paper Regarding Sentencing Factors, 11-cr-0054-6 (N.D. Ill. Aug. 2, 2013), ECF No. 175.  He was sentenced to probation.[3]

Here, Dr. Todd's lifetime of service to others also warrants a non-Guidelines sentence. The individuals he has positively impacted throughout his career include not only the thousands of chronically-ill patients he has served with empathy and compassion, but also the medical community and the public at large through numerous and diverse civic and charitable works. Such work has included teaching and lecturing to medical students and professional colleagues, sharing his expertise through peer reviewed publications, working with and providing medical treatment to athletes (e.g., NYC Marathon, Golden Gloves, Special Olympics), serving on advisory boards (e.g., Worldwide Children's Fund), testifying twice before Congress on the dangers of steroids and human growth hormone, feeding the homeless and distributing backpacks (PCNY), and founding the New York Pain Society, whose mission is dedicated to the care of patients suffering chronic pain and whose positive impact cannot be overstated.

The common thread running through all of Dr. Todd's many good works was a desire to make a positive impact on the lives of others.  Such work has resulted in numerous Top Physician awards, and other recognition, including a 2016 Proclamation from the New York State Assembly commending Dr. Todd's lifetime commitment to helping people dealing with issues of chronic pain.  *See* Ex. 3.

---

[3]   *See also United States v. Serafini*, 233 F.3d 758, 774-75 (3rd Cir. 2000) (defendant faced a guideline range of 18 to 24 months; sentence reduced to 5 months where the defendant "was an exceptionally giving person" and the defendant's acts "weren't acts of just giving money, they were acts of giving time, of giving one's self."); *United States v. Tomko*, 562 F.3d 558, 572 (3d Cir. 2009) (affirming reduction to a sentence of probation from a recommended range of imprisonment of between 12 to 18 months due largely to the defendants "exceptional" charitable acts and good works).

Dr. Todd respectfully requests that the Court take this extraordinary body of professional, civic, and charitable good works into consideration and consider imposing a sentence of home confinement or, in the alternative, a minimal period of imprisonment.

**B.      The Nature and Circumstances of the Offense Warrant a Below-Guideline Sentence**

Dr. Todd is convicted of participating in a conspiracy in which he accepted kickbacks (in the form of speaking fees) in return for prescribing a pain medication known as Subsys.   Dr. Todd is deeply remorseful for his conduct.  As stated in his letter to the court:

> I write to express my great remorse for my participation in the Subsys speaker program.  I deeply regret my decision to ever join the program, and that I allowed the lecture fees I received to influence me.  I violated my patients' trust in me.  I have caused my family to suffer.  I cannot tell you how sorry I am.  I made a grave mistake, take full responsibility for my actions, and will work the rest of my life to make amends.

Ex. 1 at 1.  Dr. Todd's remorse is sincere.  As friend Alexa Brandon notes, "The sincere regret and remorse that Dr. Todd has been experiencing is openly visible on his face each time that I have been in his presence."  Ex. 4 at 12.

Dr. Todd understands that there is no excuse for his criminal conduct.  However, as discussed in further detail below, he asks the Court to take into consideration (a) the following mitigating circumstances surrounding his entry and participation in the Subsys speaker program and (b) that his Guideline sentencing range is based on an inflated "benefit conferred" calculation that overstates his culpability and renders his Guideline sentencing range as unduly punitive.

1.      *Several Mitigating Factors Should Be Considered  When Evaluating Dr. Todd's Entry and Participation in the Subsys Speaker Series*

***First***, we ask the Court to consider that Dr. Todd prescribed Subsys long before he was ever involved with the Subsys speaker series either as a guest attendee or later as a lecturer.

When Subsy hit the market in March 2012, Dr. Todd saw its potential benefits to his patients who suffered from chronic and debilitating pain. Many of them had previously been prescribed competing medications, including other TIRFs. In most instances, the patients had previously used fentanyl-based opioid medications, but those medications often had bad side effects, including harming patients' teeth and gums. When Subsys, a new pain medication in a market that rarely sees new products, was approved and released, Dr. Todd turned to it as an innovative therapy precisely for these opioid-tolerant patients. PSR ¶ 33 (Subsy was approved in 2012 for "the management of breakthrough pain in cancer patients…who were already receiving and tolerant of opioid therapy for their underlying persistent cancer pain."). From November 2012 to October 2013, Dr. Todd prescribed Subsys to at last nine patients, hoping to ease their pain and provide effective treatment.

*Second*, although Dr. Todd first attended a Subsys lecture for the first time as a guest of Dr. Goldstein's in late 2013, he did not thereafter immediately agree to join the speaker series as a lecturer. At this time, Dr. Todd was in the midst of a trial period, during which he was continuing to prescribe Subsys to his patients and was evaluating its effectiveness. When Dr. Todd's patients responded well to the drug during this trial period, this enhanced his confidence in the medication. Only after his patients responded well and his confidence in Subsys' efficacy grew did Dr. Todd agree to join the speaker series the following year in February 2014.

*Third*, when Dr. Todd decided to join the Subsys speaker series, his decision did not rest on the amount of fees he would earn, but rather rested on whether he believed Subsys was a good drug that he would stand behind and prescribe to his patients. At that point, Dr. Todd was already an experienced speaker, having worked on speaking series for many other pharmaceutical companies. For example, between the years 2001 and 2014, he lectured for

Purdue, Merck, Pfizer, Depomed, and Faulding Laboratories on pain medications like Kadian, Vioxx, and Oxycontin, which paid him approximately the same rate per lecture as Insys.

*Fourth*, when Dr. Todd decided to join the Subsys speaker program, he did not know that his engagements would be conditioned on increasing Subsys prescriptions.  And he did not join with the intention of compromising his duties to his patients.  Indeed, as the government acknowledges, for many months after he joined the Subsys speaker series, Dr. Todd's prescribing practices did not change.  PSR ¶ 68 (between the time he started as a speaker in March 2014 and through September of that year, "the total quantity of the Fentanyl Spray Schlifstein prescribed did not increase substantially").  As a result, Subsys' representatives retaliated and refused to assign him further speaking engagements for a period of time. *Id.* (Subsys' representatives "significantly decreased Schlifstein's Speaker Programs for the fourth quarter of 2014" to "send a message to Schlifstein that in order to be allocated additional Speaker Programs, Schlifstein would need to prescribe higher volumes of Fentanyl Spray").

After  Subsys' representatives told Dr. Todd that "he would be assigned more Speaker Programs only if he prescribed more Fentanyl Spray," *id.* ¶ 70, Dr. Todd, to his everlasting regret, did not terminate the agreement immediately.  He instead acceded to the sale representatives' demands, and began favoring Subsys over other competing treatments.  Such wrongful conduct was contrary to everything Dr. Todd had been taught and stood for in his life, as a physician, educator and civic volunteer.  It therefore did not take long for him to grow disenchanted with the Subsys speaker series.  Uncomfortable with the constant pressure he was receiving from Subsys' representatives to prescribe Subsys, Dr. Todd stopped prescribing Subsys to new patients in June 2015, and did just two more speaking engagements thereafter (in July and September) because he had previously committed to them.  Thereafter, although Dr. Todd

continued to receive regular requests from Subsys' representatives that he sign up for more speaking engagements (requests that continued until the end of 2016), he did not do so.  He did not want to have anything more to do with the speaker series.

*Fifth,* we also ask the Court to take into consideration that, during the period in question, Dr. Todd was suffering through a traumatic period, caused by the sudden and unexpected death of his brother Craig, who died in January 2014 from complications after a stroke.  Craig was Dr. Todd's closest confidant and best friend.  Craig's death, which left behind his wife Jamie, and two young daughters, devastated Dr. Todd.  As his sister-in-law Jamie Schlifstein notes, "I know that the unique bond they had, after sharing their lives from a young age, was very difficult for Todd to handle losing….He seemed lost without his best friend and brother to talk with and rely on." Ex. 4 at 67.  Although Craig's death "crushed" Dr. Todd, he remained strong for the sake of his sister in law and his nieces, who "looked to Todd for leadership and help."  Ex. 4 at 48.  As Harvey Schlifstein and Mr. Lieber describes, "He took care of everything," and "immediately began to fulfill a role as a surrogate father for the girls." Ex. 4 at 48, 65.  In his own words, "Craig's death devastated me.  He was my best friend.  He was someone who I would often run things past for his opinion.  Without him, I became lonely and depressed." Ex. 1 at 2.

In the midst of that depression, Dr. Todd began suffering from anxiety, insomnia, sleep apnea, and other ailments.  Looking back on this time, Dr. Todd believes he sought a reprieve from such troubles and solace for his sadness, in part, by socializing at the speaker series, which began only a few weeks after Craig's death. Attending to speaker series provided him companionship, diversion and helped fill a void left by Craig's death.  In retrospect, the speaking engagements offered him an escape from his grieving.  He believes that the stress, depression and anxiety of this period contributed to his poor judgment and impaired his ability to resist

overtures from Subsys' representatives that he compromise his independent judgment in favoring Subsys over other competing medications for his patients. *See* Ex. 1 at 1.

*Sixth,* despite his breach of his patients' trust, Dr. Todd prescribed Subsys in appropriate doses only to patients who he believed could benefit from the treatment. All of the patients to whom Dr. Todd prescribe Subsys were monitored carefully and, if they did not respond well, were taken off the medication. Moreover, Dr. Todd did not prescribe the medication to patients who he believed would not be helped by the drug, even if they requested it.

\*\*\*\*\*

We respectfully suggest that the above mitigating factors warrant leniency in Dr. Todd's sentence. The case of *United States v. Nwaokocha*, 12-cr-559-4 (N.D. Ill.) is instructive. There the defendant plead guilty to violating the Anti-Kickback statute by receiving "marketing" payments in exchange for referring patients to a home health agency. At sentencing, where he faced a recommended guideline range of 30-37 months, Dr. Nawokocha, a first-time offender, plead for leniency and asked the Court to take into consideration, *inter alia*, his long 30-year career of dedicated care for patients, the fact that throughout his career he had referred patients to home health care without incident, and that he never referred anyone who he did not believe was in need of and would benefit from home care. ECF No. 366, at 1-3.

He offered these factors in mitigation for conduct that was an aberration in a life otherwise devoted to patient care and his family and which had already inflicted severe professional consequences, including the potential loss of his license. On the basis of those factors, the Court sentenced Dr. Nwaokocha was sentenced to 4 years of probation, with 250 hours of community service, and a recommendation to keep his medical license.

We respectfully request a similar sentence for Dr. Todd, who in many respects, presents a more compelling case for leniency, given his lifetime of extraordinary charitable good works and

the fact that he voluntarily stopped his participation in the speaker series.  *United States v. Greene*, 249 F. Supp. 2d 262, 265 (S.D.N.Y. 2003) (charitable good works contributed to reduced sentence of probation instead of a Guidelines range of 18 to 24 months).

        2.        *A Sentencing Range of 46 to 57 Months Overstates Dr. Todd's Culpability*

Dr. Todd's Guideline range is based primarily on a 16-level bump based on the value of the improper benefit conferred to Insys, which under the plea agreement ranges between $1.5 million to $3.5 million.  *See* Ex. 2 at 3; U.S.S.G. § 2B1.1.  We understand that calculation purports to represent the net sales that Insys derived from Dr. Todd's Subsys prescriptions from 2013 to 2015.  We respectfully submit that this calculation is unduly punitive and overstates Dr. Todd's culpability for the following two reasons.

**First**, the calculation includes and does not deduct the revenue Insys derived from Subsys prescriptions that Dr. Todd would have written absent the improper influence of his participation in the speaker program.  We respectfully suggest that this results in an overstatement of Dr. Todd's culpability because the value of benefit conferred should "most closely approximate the difference between what did happen as a result of the bribe and what would have happened without the bribe." *United States v. Leon*, 2 F. Supp. 2d 592, 597 (D.N.J. 1998).  When making that calculation, especially in the context of a kickback, courts have distinguished between legitimate and not legitimate referrals or care. *See United States v. Ricard*, 922 F.3d 639, 658 (5th Cir. 2019) (holding that district court erred by not deducting the value of the legitimate treatment provided to its patients); *United States v. Anderson*, 85 F. Supp. 2d 1084, 1106 (D. Kan. 1999) (in referral scheme that provided elderly patients necessary care they would not otherwise have been provided, court found that the improper benefit should not be calculated based on "*full amount* of the remunerations" but only the "*part* of the remunerations [that] were in exchange for bribes" because many of the transactions were "really legitimate transactions");

*United States v. Gonzalez*, 566 F. App'x 898, 901 (11th Cir. 2014) ("medically necessary services may be excluded when calculating "loss" attributable to Medicare fraud because the agency presumably would have paid for the services in the absence of the fraud").

Here, we do not understand the Government to dispute that throughout the entire period in question that (a) Dr. Todd treated patients suffering from chronic and debilitating pain; (b) these patients were in need of prescription pain medication, (c) Subsys had the potential to alleviate their pain, and (d) these patients stood to benefit from the Subsys prescriptions. The Government also admits that, although Dr. Todd joined the speaker series in February 2014, ***he did not increase his prescriptions between March and October 2014, and when he was not complying with the sales representatives' demands, they retaliated against him by not giving him speaker engagements***. *See* PSR ¶ 68. These facts strongly support the argument that Dr. Todd only prescribed Subsys to patients who he believed could benefit from the medication and that in fact, for a substantial period of time, his prescribing practices were not influenced by the speaker fees. In light of such undisputed facts, we believe that calculating his Guideline range based *all* net sales for *all* Subsys prescriptions that Dr. Todd wrote through *the entire time period*, without making any deduction for the legitimate and medically necessary care he provided, is unduly punitive and overstates his culpability.

***Second***, we also ask the Court to take into consideration that that the 16-level bump is based on net sales, which fails to deduct certain costs of manufacturing and selling the drug, including employees salaries. In numerous other similar contexts, including in the Guideline commentary, similar deductions for costs to deduce the "net benefit" have been deemed appropriate. *See, e,g.*, U.S.S.G. 2B4.1 ("[I]f a bank officer agreed to the offer of a $25,000 bribe to approve a $250,000 loan under terms for which the applicant would not otherwise qualify, the

court, in increasing the offense level, would use the greater of the $25,000 bribe, and the savings in interest over the life of the loan compared with alternative loan terms."); U.S.S.G. 2C1.1 ("A government employee, in return for a $500 bribe, reduces the price of a piece of surplus property offered for sale by the government from $10,000 to $2,000; the value of the benefit received is $8,000."); *United States v. Pena*, 268 F.3d 215, 221 (3d Cir. 2001) (using example of a doctor who bribes an official and obtains referrals to sell medical devices for $100, but they were worth $60-which he did pay, then "the net benefit was $40."); *United States v. Glick*, 142 F.3d 520, 525 (2d Cir. 1998) ("[T]he appropriate measure of the "improper benefit" . . . is the net value of the benefit received, rather than the gross income received.").   Here, Insys incurred costs to manufacture the medication and the medication itself had value to its patients.  The net benefit to Insys was therefore much lower than the stated value of the improper benefit conferred.

### C.   A Lengthy Sentence of Imprisonment Is Not Needed to Reflect the Seriousness of the Offense, Promote Respect for the Law, or Impose Just Punishment

In requesting a non-guidelines sentence, Dr. Todd does not seek to minimize the seriousness of his conduct.  He asks the Court, however, to consider the numerous collateral consequences he has suffered as a result of his conviction.  *See United States v. Nesbeth*, 188 F. Supp. 3d 179, 188 (E.D.N.Y. 2016) (collecting cases and concluding that collateral consequences are properly considered as a 3553(a) factor at sentencing).   In this case, the collateral consequences suffered by Dr. Todd are numerous and severe.

*First*, as a result of his conviction, Dr. Todd's medical license has been rendered inactive. This is devastating to Dr. Todd, whose entire life was devoted to becoming and serving as a doctor.  Loss of a medical license is a significant collateral consequence that warrants a non-Guideline sentence.  *See, e.g.*, *United States v. Metellus*, 2010 WL 1174303, at *2 (E.D.N.Y.

24

Mar. 17, 2010) (considering likely loss of law license as a collateral consequence at sentencing; defendant facing a 63-78 month Guidelines range was sentenced to 6 months of imprisonment).

*Second*, as a consequence of his conviction, Dr. Todd is losing his livelihood because he must sell his medical practice.  Public and private health care payers, including every private health insurance carrier, have ceased doing business with him.  He has also had to turn over his DEA license, preventing him from writing any prescriptions for controlled substances of any kind.  Dr. Todd has devoted his sweat over his entire life to building this practice.  He has no children—he has come to regard his staff and his patients like family.  Losing this business is losing everything he has known.  *See United States v. Anderson*, 267 F. App'x 847, 850 (11th Cir. 2008) (affirming below-Guidelines sentence based in part on job loss and diminished income); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (departing from Guidelines because of destruction of defendant's business as a consequence of conviction, and noting that "the substantial loss of assets and income resulting from this have decreased for the foreseeable future his ability to commit further crime of the type he was tempted to undertake").

*Third*, as a result of his conviction, NYU Medical School has revoked his appointment as a lecturer, ending an affiliation that began nearly 25 years ago, when he graduated from medical school.  His board certifications with the American Academy of Physical Medicine and Rehabilitation, and American Board of Physical Medicine and Rehabilitation have also been revoked.  Such losses have been especially painful to Dr. Todd, who has devoted much of his professional career to educating medical students and sharing his professional expertise with professional colleagues.

*Fourth*, due to his conviction, Dr. Todd has resigned his positions in numerous civic and charitable organizations, including the New York Pain Society, that he spent countless hours volunteering and working in service of others.

*Fifth*, he will forever have to live with the public disgrace and humiliation of his conviction, which has been heavily publicized. As a result of the publicity around his conviction, Dr, Todd has lost clients, income, and job opportunities, including his position as a medical advisor on other pharmaceutical projects.  Those losses are a basis for a non-Guidelines sentence as well. *See United States v. Shaw*, 2004 WL 1858336, at *4 (E.D. Pa. Aug. 11, 2004) (listing damage to reputation as one of many collateral consequences of a conviction); *United States v. Mora–Gomez*, 875 F.Supp. 1208, 1211 n.6 (E.D. Va. 1995) (same); *accord United States v. Hoffmann*, 2006 WL 3390736, at *6 (D. Neb. Nov. 22, 2006) (sentencing below Guideline range based, in part, on the "serious consequences" suffered by defendant already, including publicity of his prosecution and damage to his reputation).

The above are just some examples of the numerous and significant collateral consequences Dr. Todd has suffered as a result of his conviction.  Dr. Todd has been stripped of his identity as a physician and his standing in the community.  We respectfully ask the Court to take these consequences into consideration in determining a below Guidelines sentence.

### D.     A Lengthy Sentence of Imprisonment Is Not Needed to Deter Future Misconduct or Protect the Public

Dr. Todd is a first-time, non-violent offender, who is not practicing medicine, has closed and sold his medical practice, does not prescribe medications any longer, and no longer participates in any speaking engagements whatsoever.  His incapacitation means he is highly unlikely to recidivate. *See United States v. Butler*, 264 F.R.D. 37, 40 (E.D.N.Y. 2010) ("Specific deterrence is achieved through incapacitation [and defendant's] loss of his securities license");

26

*United States v. Valverde-Solano*, 299 F. App'x 21, 24 (2d Cir. 2008) (noting that first-time offenders have the lowest risk of recidivism). Because his crime was an aberration and one that will not be repeated, Dr. Todd merits strong consideration for a non-Guidelines sentence. *See United States v. Patel*, 11-cr-491-5 (N.D. Ill.) (defendant doctor convicted of six counts of Anti-Kickback Statute violations; although he faced a 27 to 33-month Guideline range, he was sentenced to 8 months because, in part, his crime was an aberration of a first-time offender).

A Guidelines sentence is also not necessary here to protect the public—with the help of therapy, the support of his family, and a renewed religious faith, Dr. Todd is in a different, healthier place in his life now. Ex. 1 at 2. Indeed, when Dr. Todd began seeking mental health treatment in 2017 to address his anxiety issues, he only then began to fully appreciate the mental strain he was under in 2014. Through therapy, Dr. Todd understand more clearly his behaviors in 2014 and his vulnerability at the time. He continues to seek treatment for his mental health and well-being, including going to regular therapy sessions with his psychologist.

As Dr. Todd writes in his letter to the Court, if there is a silver lining in his conviction, it is that this experience has brought him closer to his family and friends: "I would like the Court to know that this experience has changed me forever. It has given me an opportunity to really look at what is important and I have made significant changes to my life since this started….I have become closer to my family, especially my sister-in-law Jamie, my uncle Harvey Schlifstein, and my cousin Steven." Ex. 1 at 2.

Given his care for his family members, Dr. Todd is rightfully regarded as "the bedrock for his family." Ex. 4 at 65. His greatest concern now is that a lengthy period of incarceration will negatively impact his nieces, who regard Dr. Todd as a father figure following Craig's death. As his uncle Harvey writes, "Now his nieces need him even more…Todd is the girl's

father figure. He is all they have a male figure." Ex. 4 at 66.  His sister-in-law Jamie echoes the

negative impact it would have on the family: "They would be devastated if he had to go to jail.  I

would be too. It will be taking away the closest thing they have to a father, and my brother." Ex.

4 at 68.  Dr. Todd thus seeks a reduced sentence so that he can continue taking care of his family

and making amends to society.

## IV.      CONCLUSION

For all the reasons set forth herein, Todd Schlifstein respectfully requests a sentence of

home confinement or, in the alternative, a minimal period of incarceration.

DATED:     New York, New York                    Respectfully submitted,
           October 9, 2019


                                        By:   */s/ Alex Spiro*
                                              _____
                                              Alex Spiro
                                              QUINN EMANUEL URQUHART &
                                              SULLIVAN, LLP
                                              51 Madison Avenue, 22nd Floor
                                              New York, New York  10010-1601
                                              Telephone:  (212) 849-7000
                                              alexspiro@quinnemanuel.com

                                              *Attorneys for Dr. Todd Schlifstein*